ATTORNEYS FOR PETITIONER:
**DAVID A. SUESS**
**BENJAMIN A. BLAIR**
FAEGRE DRINKER BIDDLE
& REATH LLP
Indianapolis, IN

ATTORNEYS FOR RESPONDENT:
**MARILYN S. MEIGHEN**
ATTORNEY AT LAW
Carmel, IN

**BRIAN A. CUSIMANO**
ATTORNEY AT LAW
Indianapolis, IN

# IN THE
# INDIANA TAX COURT

|  |  |  |
|---|---|---|
| SOUTHLAKE INDIANA, LLC, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Case No. 18T-TA-00030 |
| | ) | |
| LAKE COUNTY ASSESSOR, | ) | |
| | ) | |
| Respondent. | ) | |

**FILED**
Dec 08 2020, 2:52 pm
**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ON APPEAL FROM A FINAL DETERMINATION OF
THE INDIANA BOARD OF TAX REVIEW

**FOR PUBLICATION**
**December 8, 2020**

WENTWORTH, J.

Southlake Indiana, LLC has appealed the final determination of the Indiana Board of Tax Review valuing its real property for the 2011 through 2014 tax years.[1] Upon review, the Court affirms in part, and remands in part.

_____

[1] Substantial portions of the administrative record in this case have been designated as confidential. Consequently, this opinion will provide only that information necessary for the reader to understand its disposition of the issues presented. See IND. ST. ACCESS RULE 9(A)(2)(d) (2020).

**FACTS AND PROCEDURAL HISTORY**

Southlake owns the Southlake Mall, a super-regional shopping mall located in Hobart, Indiana, that opened in 1974. For purposes of this appeal, the Mall is comprised of twelve parcels that make up its land, surface parking lots, and retention ponds; the Mall's inline retail space and attached JCPenney and Dick's Sporting Goods stores; a detached movie theatre, Gander Mountain store, and Firestone store; and several other freestanding buildings situated on outparcel lots that are used as restaurants, a jewelry store, and a bank. (See generally Pet'r Pet. Jud. Rev. Fin. Determination Ind. Bd. Tax Rev. at 3 ¶¶ 11-12; Cert. Admin. R. at 741-42, 1067-1108.)[2]

In February of 2014, the Ross Township Assessor issued Form 113 Notices of Assessment Change to Southlake that retroactively increased the assessed values of eight of the twelve parcels from a combined $110,432,100 in 2010 to $239,200,000 for each of the 2011, 2012, and 2013 tax years. Southlake appealed those assessment increases, as well as the combined $3,690,500 assessment assigned to the remaining four parcels for the 2013 tax year. After the Lake County Property Tax Assessment Board of Appeals (PTABOA) denied the appeals, Southlake sought relief with the Indiana Board.

While those appeals were pending at the Indiana Board, Southlake filed an appeal with the PTABOA challenging the Mall's 2014 assessed value on all twelve parcels. The PTABOA did not act on the 2014 appeals and Southlake subsequently transitioned them to the Indiana Board pursuant to Indiana Code § 6-1.1-15-1(o). The Indiana Board conducted a hearing on all of Southlake's appeals in June and July of 2017.

---

[2] The parcels that reflect the Mall's three other department store anchors, another restaurant, and a Kohl's store, are not included in this appeal. (See Pet'r Pet. Jud. Rev. Fin. Determination Ind. Bd. Tax Rev. at 3 ¶¶ 11-12; Cert. Admin. R. at 741.)

2

<u>The Assessor's Evidentiary Presentation to the Indiana Board</u>

During the Indiana Board hearing, the Lake County Assessor ("Assessor") acknowledged that he bore the burden of proving that the assessment increases were correct because the Mall's assessed value increased by more than 5% between 2010 and 2011. (<u>See</u> Cert. Admin. R. at 3661-62.) <u>See</u> <u>also</u> IND. CODE § 6-1.1-15-17.2(a), (b) (2017) (explaining the burden of proof at the time the Indiana Board conducted its hearing). To meet that burden, the Assessor presented an appraisal, completed in conformance with the Uniform Standards of Professional Appraisal Practice (USPAP), that valued the Mall for each of the years at issue. The Assessor also presented the testimony of Mark Kenney, a member of the Appraisal Institute (MAI), who prepared the appraisal.

Kenney's appraisal used the income capitalization approach to value the Mall. (<u>See</u>, <u>e.g.</u>, Cert. Admin. R. at 1673, 1801-79, 3760-64.) The income approach, one of three generally accepted appraisal techniques for valuing real property, applies to "income producing properties that are typically rented[ and] converts an estimate of income, or rent, [a] property is expected to produce into value through a mathematical process known as capitalization." 2011 REAL PROPERTY ASSESSMENT MANUAL (incorporated by reference at 50 IND. ADMIN. CODE 2.4-1-2 (2011)) at 2. Generally speaking, when an appraiser uses this approach to value a property, he first estimates the property's net operating income ("NOI") by deducting a vacancy and collection loss, as well as operating expenses, from its potential gross income. <u>See</u> Appraisal Institute, THE APPRAISAL OF REAL ESTATE 478-88 (14th ed. 2013) (explaining, among other things, that potential gross income includes rents for space in a property as well as "all

other forms of income to the real property – e.g., income from services supplied to the tenants, such as secretarial service, switch-board service, antenna connections, storage, and garage space, and income from coin-operated equipment and parking fees") (emphasis added).  The appraiser then selects an appropriate capitalization rate to apply against the property's NOI.  See generally id. at 492.

To estimate potential gross rental income from both the Mall's inline spaces and freestanding buildings on the outparcels, Kenney relied exclusively on their actual contract rents that he then averaged within tenant size categories.  (See, e.g., Cert. Admin. R. at 1801-21 (listing the contract rents per square foot and lease terms for each tenant for each of the years at issue), 1825 (concluding to one averaged rental estimate for all tenants within specified square footage categories), 1842, 1845, 1848, 1851 (indicating that the averaged values were then used to calculate the Mall's effective gross income ("EGI") for each of the years at issue), 4135-38, 4153-57.)  To estimate the potential gross rental income from the JCPenney and Dick's Sporting Goods stores (as well as two restaurants, the movie theatre, and the Firestone store), Kenney relied on "comparable department store and 'big box' store . . . rents[.]"  (See, e.g., Cert. Admin. R. at 1822-25, 3848-50, 4091-92, 4117-18.)

In addition to these rental income estimates, Kenney estimated other forms of income to the Mall's real property, namely the income from "specialty leasing," i.e., retail merchandising units ("RMUs"), kiosks, inline spaces occupied by temporary tenants ("TILs"), and "Brand/Media."  (See, e.g., Cert. Admin. R. at 1827-30, 1842, 1845, 1848,

4

1851, 3851-63, 4158-63.) After conducting a cost-of-occupancy analysis[3] to confirm that the Mall's health was consistent with typical industry parameters, Kenney applied a single vacancy and collection loss rate to his overall income conclusion to arrive at the Mall's EGI. (See, e.g., Cert. Admin. R. at 1830-33.)

From EGI, Kenney subtracted operating expenses – which he estimated based on the property's actual operating history – to arrive at the Mall's NOI. (See, e.g., Cert. Admin. R. at 1833-36, 1841-52.) Kenney included a management fee in his expense estimate (ranging from 3% to 4% of his EGI) as he believed the Mall, if sold, would likely be leased and managed by an institutional owner or professional manager. (See, e.g., Cert. Admin. R. at 1835-36, 4034.) Kenney testified that while intangible value rarely exists in malls, his management fee deduction would adequately account for and remove the intangible value arising from the Mall's operation as a going concern. (See, e.g., Cert. Admin. R. at 3781-83.)

Kenney next considered investor surveys and performed a band-of-investment analysis to determine that a capitalization rate of approximately 6.45% should be applied against his NOI calculation. (See generally Cert. Admin. R. at 1839-79.) After capitalizing NOI, Kenney made two final deductions. First, he deducted the amounts reported on the Mall's business tangible personal property tax returns for its furniture, fixtures, and equipment ("FF&E").[4] (See Cert. Admin. R. at 1836-37, 3974-77, 4035.) Second, Kenney

---

[3] A cost-of-occupancy analysis is "an indicator of the viability of [a] mall, a tenant, or a lease rate"; it reflects "total rent and other landlord charges as a ratio of sales per [square foot.]" (Cert. Admin. R. at 3504.)

[4] Kenney admitted that this deduction would not, however, remove any income attributable to that personal property. (See, e.g., Cert. Admin. R. at 4035-36.)

5

deducted for tenant incentive allowances.  (See, e.g., Cert. Admin. R. at 1837-39, 4034-35.)  Kenney's income approach resulted in the following value conclusions for the Mall:

| | |
|---|---|
| 2011: | $224,273,000 |
| 2012: | $239,273,000 |
| 2013: | $227,273,000 |
| 2014: | $243,273,000 |

(Cert. Admin. R. at 3360.)[5]

<u>Southlake's Evidentiary Presentation to the Indiana Board</u>

Southlake's evidentiary presentation to the Indiana Board had three parts. Specifically, Southlake presented 1) two independent reviews of Kenney's appraisal; 2) its own USPAP appraisal valuing the Mall for each of the years at issue; and 3) an analysis comparing the Mall's assessed value to those of ten other Indiana malls.

1)

Southlake presented two reviews critiquing Kenney's appraisal.  The first review was prepared by Alvin Benton, MAI.  (See Cert. Admin. R. at 994-1012.)  Benton's primary complaint was directed at Kenney's development of, and conclusions regarding, his rental income estimates for the Mall.  (See Cert. Admin. R. at 1006-08, 1011.)  Specifically, Benton asserted that Kenney's method of averaging actual contract rents to estimate the Mall's potential gross rental income was not "a meaningful analysis" and that he should have considered lease data from <u>other</u> malls instead.  (See, e.g., Cert. Admin. R. at 4461-

---

[5] Kenney initially valued the Mall at $243,927,000 for 2011; $251,927,000 for 2012; $238,927,000 for 2013; and $255,927,000 for 2014.  (See Cert. Admin. R. at 1675-76.)  Subsequently, however, Kenney conceded that he made several errors in his appraisal that resulted in an overvaluation of the Mall.  (See, e.g., Cert. Admin. R. at 3360, 4189-91, 4242-44.)  (See also Cert. Admin. R. at 3507 ¶ 28 n.3, 3513-14 ¶¶ 42-43, 45-46.)  The values stated above reflect Kenney's adjusted appraisal values after correcting those errors.  (Compare Cert. Admin. R. at 1675-76 with 3360.)

62, 4473-87.) Benton also alleged that in estimating the rental income from the anchor stores, Kenney relied on property and lease data that was not comparable to the Mall. (See Cert. Admin. R. at 4479-83.)

Southlake's second review was prepared by Dr. Jeffrey Fisher, Professor Emeritus at Indiana University's Kelley School of Business and founder/former director of its Center for Real Estate Studies. (Cert. Admin. R. at 1026-45, 4695-97.) Fisher alleged that Kenney failed to remove from his final value conclusion for the Mall the non-taxable intangible value generated through the Mall's operation as a going concern. For instance, Fisher explained that a mall's management creates intangible business value by developing an appropriate tenant mix that initially – and necessarily – hinges on the retention of anchor tenants. (See Cert. Admin. R. at 1026-28, 4711-16 (explaining that if a mall does not have anchors, it will not have inline tenants).) Fisher asserted that while deducting a management fee, as Kenney did, may have accounted for "maintaining" the value of the Mall's tenant mix, it did not account for – and remove – the value produced to create the mix in the first place. (See Cert. Admin. R. at 4715-16.) Fisher also asserted that a mall creates value through, among other things, its operating and cross-easement agreements, brand name, customer base, and profit centers. (See, e.g., Cert. Admin. R. at 1026.) Fisher believed, therefore, that the actual rents paid by the Mall's inline tenants "represent[] more than just payment for space in the [M]all." (Cert. Admin. R. at 1027, 4722-25.)

2)

During the Indiana Board hearing, Southlake also offered its own USPAP appraisal valuing the Mall for each of the years at issue. In addition, Southlake presented the

7

testimony of David Lennhoff, MAI, who prepared the appraisal.

To value the Mall, Lennhoff, like Kenney, used the income capitalization approach. (See, e.g., Cert. Admin. R. at 684-85, 739.) Lennhoff's income approach, however, began by determining the Mall's value as a going concern – a value that reflected not only the income from its real property, but also its personal property and intangible assets. (See, e.g., Cert. Admin. R. at 743, 745-46, 751-53, 804-05, 4821-24.) Lennhoff explained that with mall properties, like hotels, one must first start with the going concern – or "total assets of the business" ("TAB") – "because there is no rent for just the real property." (Cert. Admin. R. at 4815.) (See also, e.g., Cert. Admin. R. at 805 (stating "[r]egional shopping centers or similar property types almost always trade as going concerns, as there is virtually no market for its individual component parts sold separately (real estate, and tangible and intangible personal property)").) To calculate the Mall's TAB value, Lennhoff relied on its actual operating history from 2008 through 2013 to forecast income and expenses for each year at issue. (See Cert. Admin. R. at 807, 849, 891, 935.)[6] Because his "[b]ase rent to the TAB reflects contract rent[,]" Lennhoff performed his own cost-of-occupancy analysis to "gauge" the economic reasonableness of those rents, concluding that they, and thus the Mall's occupancy costs, were generally within the range of other retail properties reported in national and regional surveys. (See Cert. Admin. R. at 808, 811-17, 4858-59.)

Lennhoff then made a series of adjustments to his annual TAB income estimates so that they would reflect income from the real property only. (See, e.g., Cert. Admin. R.

---

[6] The Indiana Board's final determination examined Kenney's and Lennhoff's appraisals with respect to their 2011 valuations only, as the methodologies used therein were demonstrative of the other years at issue. (See Cert. Admin. R. at 3533 ¶ 108). Going forward, the Court will do the same.

at 807-34.) For instance, with respect to his rent estimates for the inline spaces, he deducted an amount for tenant incentives and termination fees. (See Cert. Admin. R. at 809-11.) Lennhoff also reduced his TAB income projection from specialty leasing by nearly 50% to account for the fact that while the income from those "license and use fees include[s] a real estate component, [it is] business income" not subject to property tax. (Compare Cert. Admin. R. at 807 (indicating TAB income projections for "specialty leasing [inline]," "specialty leasing," and "media (marketing)") with 831-32 (indicating the portion of that income Lennhoff believed was attributable to the real property).) Lennhoff similarly reduced his TAB income projections from common area maintenance ("CAM") expense reimbursements, less associated management fees, by more than 50% because he believed it reflected profits received by the Mall's management and therefore constituted business income as well. (Compare Cert. Admin. R. at 807 with 832-33.) (See also Cert. Admin. R. at 5009-11, 5014.)

From his estimates of income from the real property, Lennhoff deducted operating expenses – which were based on the Mall's historical operational expense data – to arrive at the property's NOI. (See, e.g., Cert. Admin. R. at 834-37 (stating, in part, that his "operating expenses [are] based primarily on the [Mall's] historical data[ because] unlike rents, which are at least partially a function of the mall enterprise . . . expenses are much more closely tied to the real property"), 4893-94.) Like Kenney, Lennhoff deducted a management fee as an operating expense. (See, e.g., Cert. Admin. R. at 834-37, 5011-14.) Lennhoff acknowledged, however, that this was the second deduction he made for such a fee. (See Cert. Admin. R. at 5011-12 (noting that he also subtracted a management fee from his estimate for CAM expense reimbursement income).)

9

From NOI, Lennhoff then made deductions to account for the Mall's "return on and of" 1) FF&E; 2) start-up costs; and 3) favorable contracts (i.e., inducements incurred to attract and retain anchor tenants). (See Cert. Admin. R. 837-42, 4901-24.) These three deductions, Lennhoff asserted, were "necessary to remove income attributable to personal property and identifiable intangibles."[7] (Cert. Admin. R. at 838.)

Next, Lennhoff relied on several investor surveys to substantiate his application of an 8% (approximate) capitalization rate to his NOI (less the deductions just described). (Cert. Admin. R. at 842-45, 4924-33.) To this indicated value, Lennhoff applied an adjustment for stabilized vacancy because the Mall's actual vacancy was greater than what he computed "market vacancy" to be.[8] (See Cert. Admin. R. at 846-47, 4933.) Lennhoff also made a "demising" adjustment to account for the pending loss of a Borders store and a vacant Big Dollar store space. (See Cert. Admin. R. at 845-48, 975 (indicating that the demising adjustment was not made for the 2014 year), 4935-37.) After these adjustments, Lennhoff's income approach resulted in the following value estimates for the Mall:

| | |
|---|---|
| 2011: | $ 98,300,000 |
| 2012: | $114,500,000 |
| 2013: | $129,600,000 |
| 2014: | $146,300,000 |

---

[7] Residual intangibles, Lennhoff continued, would be "removed by loading the capitalization rate[.]" (Cert. Admin. R. at 838.)

[8] Specifically, Lennhoff calculated an annual rent loss adjustment by multiplying his concluded market rent for the Mall's inline space by the difference between a stabilized 88% occupied square footage and the existing occupied square footage; he then converted that figure to a 9-month equivalent and deducted that amount for each year. (See Cert. Admin. R. at 846-49.)

(See Cert. Admin. R. at 848, 889, 934, 979.)

3)

Finally, Southlake presented a comparable assessment analysis prepared by Benton pursuant to Indiana Code § 6-1.1-15-18, asserting that it conclusively established that the Mall was overassessed.[9] In his analysis, Benton selected ten regional or super-regional malls, all located in Indiana, each with three or more anchors and at least 700,000 square feet of gross leasable area. (See Cert. Admin. R. at 1211-1647, 4517-25.) Benton then developed a list of numerous property and market characteristics that he used to determine whether those properties were superior or inferior to the Mall.[10] (See generally Cert. Admin. R. at 4526-48.) After comparing all these properties' assessed values, Benton determined that on a per square foot basis, the Mall was assessed at more than three times the median and average of the malls that were superior to it. (See Cert. Admin. R. at 1651-58, 1664, 4565-72.) In fact, Benton's analysis revealed that the Mall had the highest assessed value – both on a per square foot and a gross basis – of any of those malls, including the exclusive Fashion Mall in Indianapolis. (See Cert. Admin. R. at 1651-58.)

<u>The Indiana Board's Final Determination</u>

On November 21, 2018, the Indiana Board issued its final determination in the matter. In that final determination, the Indiana Board made two overarching conclusions.

---

[9] Indiana Code § 6-1.1-15-18 states that "[t]o accurately determine market value-in-use, a taxpayer or an assessing official may . . . in a proceeding concerning property that is not residential property, introduce evidence of the assessments of any relevant, comparable property." IND. CODE § 6-1.1-15-18(c) (2017).

[10] The characteristics included, among other things, the age of the mall; date of its last renovation; gross leasable area; number, identity, and sizes of the anchors; and demographics of the respective trade area. (See generally Cert. Admin. R. at 4526-48.)

11

First, noting that both Kenney and Lennhoff relied on the Mall's contract rents in their income analyses, it concluded that any argument about whose estimates best reflected the market was "misplaced" because they were substantially similar. (See Cert. Admin. R. at 3535-36 ¶¶ 110-12.) Second, the Indiana Board concluded that Kenney's approach to valuing the Mall, and his rationale supporting that approach, was much more understandable than Lennhoff's. (See, e.g., Cert. Admin. R. at 3522 ¶ 77 (explaining that Lennhoff's "calculation of vacancy for inline space was difficult to follow"), 3524 ¶ 81 (stating "Lennhoff's explanation of [his] double deduction of the management fee from both income and expenses was difficult to follow"), 3535 ¶ 109 (stating "[i]t is very easy to understand Kenney's conclusions[] and how they compare to the [] Mall's historical operations in each category of income or expense"), 3541 ¶ 119 (explaining that "Lennhoff's treatment of . . . [RMUs] was largely opaque"), 3542 ¶ 123 (asserting that Kenney's calculations of CAM income "are transparent [while] Lennhoff's are not").)

In light of those conclusions, the Indiana Board stated:

> While Kenney's analysis of income had . . . flaws, it was largely supported by Lennhoff's income estimates and survey data. The appraisers diverged through Lennhoff's deductions from income, particularly in regard to kiosk, TIL[s], and CAM income. These deductions[, however,] were conclusory and unsupported. Lennhoff's overall lack of transparency made his analysis less persuasive than Kenney's. . . . After weighing the evidence, the Board must find that Kenney presented the more persuasive estimate of NOI for each year on appeal.

(Cert. Admin. R. at 3545 ¶ 128.) Nonetheless, the Indiana Board noted that

> [Kenney's] NOI must be adjusted to deduct Lennhoff's personal property adjustment and utility profits. Lennhoff's cap rates are best supported by the evidence, and these reasonably remove intangibles associated with the anchor agreements and business operations. Finally, the capitalized income must be adjusted for Kenney's tenant incentive[ deductions], Lennhoff's stabilization calculations, and

12

Lennhoff's excess parcel values.

(Cert. Admin. R. at 3552-53 ¶ 149.)  After making these adjustments, the Indiana Board valued the Mall as follows:

|  |  |
|---|---|
| 2011: | $173,497,036 |
| 2012: | $180,400,178 |
| 2013: | $179,367,932 |
| 2014: | $190,620,448 |

(Cert. Admin. R. at 3553 ¶ 150.)

With respect to Southlake's comparable assessment analysis, the Indiana Board chose to give it little weight given that it had two USPAP appraisals from proven appraisal experts.  (See Cert. Admin. R. at 3554 ¶ 152.)  The Indiana Board explained that this was due in part to the fact that neither Kenney nor Lennhoff relied on data from other comparable malls in their appraisals.[11]  (See Cert. Admin. R. at 3554 ¶ 152.)  In any event, the Indiana Board explained, the analysis did nothing more than "merely prove[] a fact not in dispute:  an income approach valuation might reach a different result than a [] cost approach valuation" performed under Indiana's Assessment Manual and Guidelines. (Cert. Admin. R. at 3554 ¶ 152.)  Thus, "[w]hile [Indiana Code § 6-1.1-15-18] requires the admission and consideration of [the] comparable assessment[ analysis], it does not require the Board to give it more weight than a USPAP[-]compliant appraisal."  (See Cert. Admin. R. at 3554 ¶ 152.)

---

[11] While Benton's comparable assessment analysis tended to focus on the physical attributes that distinguished the malls, see supra note 10, the Indiana Board found that given how Kenney and Lennhoff approached their valuation assignments, there were two more "critical" factors of comparison than assessment values:  the malls' inline sales and their cost-of-occupancy rates. (See Cert. Admin. R. at 3554 ¶ 152.)

13

On December 31, 2018, Southlake initiated an original tax appeal. On September 27, 2019, the Court conducted oral argument on the matter. Additional facts will be supplied when necessary.

## STANDARD OF REVIEW

The party seeking to overturn an Indiana Board final determination bears the burden of demonstrating its invalidity. Osolo Twp. Assessor v. Elkhart Maple Lane Assocs., 789 N.E.2d 109, 111 (Ind. Tax Ct. 2003). Consequently, Southlake must demonstrate to the Court that the Indiana Board's final determination in this matter is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; contrary to constitutional right, power, privilege, or immunity; in excess of or short of statutory jurisdiction, authority, or limitations; without observance of procedure required by law; or unsupported by substantial or reliable evidence. IND. CODE § 33-26-6-6(e)(1)-(5) (2020).

## DISCUSSION AND ANALYSIS

At the outset, the Court notes that Southlake has claimed, as it did before the Indiana Board, that the Ross Township Assessor violated Indiana Code § 6-1.1-9-1 when, in 2014, she retroactively increased the Mall's 2011, 2012, and 2013 assessments based on Kenney's appraisal report that valued the Mall for 2011 because she did not (nor could have had) the requisite statutory "belief" that the Mall's 2012 and 2013 assessed values were understated. (See Pet'r Br. at 45-48.) See also IND. CODE § 6-1.1-9-1 (2014) (stating that an assessing official may increase a property's assessed value between general reassessments when she "believes that any taxable tangible property has been omitted from or undervalued on the assessment rolls") (amended 2017). The Indiana

14

Board rejected that claim, finding that Kenney's appraisal report was sufficient for the Ross Township Assessor to formulate a belief that the Mall was undervalued. (See Cert. Admin. R. at 3502 ¶¶ 14-16.) The Court agrees with – and therefore adopts as its own – the Indiana Board's rationale rejecting that claim.

In the remainder of its appeal, Southlake argues that three primary errors in the Indiana Board's final determination necessitate its reversal. (See Oral Arg. Tr. at 5-6.) First, it argues that the Indiana Board improperly adopted and used Kenney's rental income estimates to value the Mall because he did nothing to demonstrate that they actually reflected the market as required by Indiana law. (See Oral Arg. Tr. at 5-6, 10.) Second, Southlake argues that the Indiana Board improperly included in its valuation of the Mall the non-taxable value attributable to personal property, business income, and intangible assets. (See, e.g., Oral Arg. Tr. at 6, 12, 28.) Finally, Southlake maintains that the Indiana Board failed to meaningfully address its comparable assessment analysis that clearly demonstrated that the Mall was overassessed. (See Oral Arg. Tr. at 6.)

### 1.    Market Rent

To develop an opinion of value under the income approach, the fee simple interest in the property must be determined based on an estimate of market rents. See, e.g., Shelby Cnty. Assessor v. CVS Pharmacy, Inc. #6637-02, 994 N.E.2d 350, 354 (Ind. Tax Ct. 2013); Grant Cnty. Assessor v. Kerasotes Showplace Theatres, LLC, 955 N.E.2d 876, 881 (Ind. Tax Ct. 2011) (explaining that "'[a]ny potential value increment in excess of a fee simple estate is attributable to the particular lease contract . . . [and] constitute[s] contract [rights] rather than real property rights'") (citation omitted). See also THE APPRAISAL OF REAL ESTATE at 447, 466 (explaining that in fee simple valuations,

15

income from rentable space is to be estimated using market rent levels). Contract rents may be used, however, when the evidence demonstrates that they reflect the market. Southlake Indiana, LLC v. Lake Cnty. Assessor, 135 N.E.3d 692, 697 (Ind. Tax Ct. 2019), review denied.

On appeal, Southlake argues that it was improper for the Indiana Board to adopt and use Kenney's rental income estimates because he did not demonstrate that they reflected the market. Southlake explains that Kenney simply used contract rents, admitting that he did not 1) adjust them to reflect any changes in economic conditions between lease start dates and the years at issue; 2) adjust them to account for differences between the Mall and the other properties he used as comparables; or 3) compare any of his conclusions with data from outside the property. (See generally Pet'r Br. at 11-18 (citing, e.g., Cert. Admin. R. at 1801-24, 3826, 3848-49, 4087-93, 4114-20, 4138, 4147-49, 4153-57).) Southlake argues that these failures rendered Kenney's estimates "useless" and it was therefore improper for the Indiana Board to adopt and use them in its valuation of the Mall. (See, e.g., Pet'r Br. at 17.) The Court does not find Southlake's argument persuasive for the following two reasons.

First, based on all of the evidence before it, the Indiana Board could reasonably conclude that Kenney's rental income estimates reflected the market. See, e.g., CVS Corp. (#6698-02) v. Monroe Cnty. Assessor, 83 N.E.3d 1281, 1285-86 (Ind. Tax Ct. 2017) (explaining that a final determination is supported by substantial and reliable evidence if a reasonable person reviewing the administrative record could find enough relevant evidence to support it). Kenney explained that because super-regional malls are markets unto themselves, the contract rents of the tenants within the property are the best

16

indicators as to what rents are appropriate in that market. (See, e.g., Cert. Admin. R. at 1801.) Kenney's rationale is buttressed by the fact that Lennhoff also used the Mall's contract rents as the starting point for his income approach. (See Cert. Admin. R. at 807-08.) Moreover, both Kenney and Lennhoff relied on a cost-of-occupancy analysis – which examines the reasonableness of a property's rents in connection to its market – as support for their rental income estimate conclusions. (Compare, e.g., Cert. Admin. R. at 811-17 (Lennhoff's cost-of-occupancy analysis) with 1830-32 (Kenney's cost-of-occupancy analysis).)

Even more importantly, and as the Indiana Board explained in its final determination, the evidence demonstrates that "[when] the two appraisals are placed side-by-side . . . there is substantial agreement between the appraisers as to [their ultimate conclusions of] market rent." (Cert. Admin. R. at 3536 ¶ 112.) Indeed, in comparing Kenney's and Lennhoff's overall rental income estimates for the inline space, for instance, the difference between the two is not a function of the actual rental income per square foot conclusions themselves, but rather is explained by 1) where the two appraisers accounted and deducted for tenant improvements,[12] 2) a square footage discrepancy, and 3) how much kiosk income each appraiser considered to be attributable

---

[12] Lennhoff adjusted for tenant improvements within his market rent per square foot calculation (i.e. as an "above-the-NOI line" deduction); whereas, Kenney made a lump-sum adjustment after he capitalized NOI (i.e., a "below-the-NOI line" deduction). See supra pp. 5-6, 10. Typically, deductions for tenant improvements are made "below-the-line." See Appraisal Institute, THE APPRAISAL OF REAL ESTATE 474-75 (14th ed. 2013).

to the real property.[13]  (Compare, e.g., Cert. Admin. R. at 819 (Lennhoff's market rent projections for the inline space) with 1842 (Kenney's).)  (See also Cert. Admin. R. at 3536-37 ¶¶ 113-14, 3540-41 ¶¶ 118-19 (the Indiana Board's comparison of the two).)  But even in those instances where Kenney's and Lennhoff's rental income per square foot conclusions were different, the Indiana Board ultimately found Kenney's more compelling because data in "The Dollars and Cents of Shopping Centers," a national industry publication cited by Lennhoff himself, provided more support for Kenney's estimates than Lennhoff's.  (Compare, e.g., Cert. Admin. R. at 821-23 (Lennhoff's valuation of the JCPenney store), 827-31, 1665-66 (Lennhoff's valuation of the Dick's Sporting Goods store, the movie theater, and the freestanding buildings situated on outparcel lots), with 1802-05, 1842 (Kenney's valuation of the same property segments), and 3537-39 ¶¶ 115, 117 (the Indiana Board's reconciliation of the competing estimates).)  Given the totality of this evidence, the Court will not disturb the Indiana Board's reasonable conclusion that Kenney's income estimates did in fact reflect the market.[14]

This first reason neatly segues into the second reason why Southlake's argument is unavailing:  it is merely an attempt to have the Court reweigh the evidence in its favor.  More specifically, Southlake argues that the Indiana Board failed to properly apply Indiana

[13] This difference, as the Indiana Board would ultimately observe, demonstrates the seminal issue in this case:  whether there is intangible business value present in this property's income that must be extracted.  (See Cert. Admin. R. at 3495-96 ¶ 2.)  (See also Cert. Admin. R. at 4910 (where Southlake acknowledges that extracting intangible value through an anchor inducement deduction is "one of the most substantial issues . . . in this case" (emphasis omitted)).)

[14] The Court acknowledges Southlake's repeated assertion that Lennhoff's and Kenney's income estimates were not "substantially similar" because Lennhoff's estimates still needed to be adjusted to remove value attributable to personal property and intangibles.  (See Pet'r Br. at 18-19; Cert. Admin. R. at 879.)  Nonetheless, the propriety of those adjustments is also in question and will be addressed later in the opinion.

Code § 6-1.1-15-17.2, known as the "Burden-Shifting Statute," because it had to rely on Lennhoff's evidence to find that the Assessor made a prima facie case. (See, e.g., Pet'r Br. at 7-9; Pet'r Reply Br. at 1-4; Oral Arg. Tr. at 7-8.)

The Burden-Shifting Statute has undergone several iterations since its 2009 enactment, ultimately requiring an assessing official to bear the burden of proving the accuracy of an annual assessment increase in excess of 5%. See IND. CODE § 6-1.1-15-1(p) (2009) (amended 2011); IND. CODE § 6-1.1-15-17 (2011) (repealed 2012); I.C. § 6-1.1-15-17.2 (2012) (amended 2014). See also Orange Cnty. Assessor v. Stout, 996 N.E.2d 871, 873-75 (Ind. Tax Ct. 2013) (discussing the history of the burden-shifting statute). While in certain circumstances this statute has changed the presumption of correctness that typically adheres to an assessed value, it has not tampered with the normal ebb and flow of the evidentiary burden that swings from one party to the other upon the production of probative evidence. See I.C. § 6-1.1-15-17.2; Stout, 996 N.E.2d at 873 n.3 (explaining that the term "burden of proof" incorporates both the burden of persuasion and the burden of production and that while the burden of persuasion never shifts between parties during the course of litigation, the burden to produce evidence often does). Consequently, when the Assessor presented a USPAP appraisal to substantiate the increase to the Mall's assessment, he sufficiently shifted the burden of production to Southlake. See, e.g., Kooshtard Prop. VI, LLC v. White River Twp. Assessor, 836 N.E.2d 501, 506 n.6 (Ind. Tax Ct. 2005) (providing that the presentation of a USPAP appraisal is the most effective evidentiary method to either substantiate or refute an assessment), review denied. Southlake then satisfied its burden of production by responding with its own USPAP appraisal.

19

At that point, having before it two competing USPAP appraisals completed by credentialed appraisers, it was the Indiana Board's duty to review them, determine the weight and credibility of each, and resolve any issues involving conflicting evidence. See Madison Cnty. Assessor v. Sedd Realty Co., 125 N.E.3d 676, 680 (Ind. Tax Ct. 2019) (stating that the Indiana Board "'determine[s] the relevance and weight to be assigned to the evidence'" because it is the trier of fact) (citation omitted); Wigwam Holdings LLC v. Madison Cnty. Assessor, 115 N.E.3d 531, 537 (Ind. Tax. Ct. 2018) (explaining that the Indiana Board exercises it discretion in assigning weight to conflicting evidence). To require the Indiana Board to determine weight and credibility subject to the rigid and formulaic approach advocated by Southlake (i.e., that it should have examined Kenney's appraisal on a "stand-alone" basis) would actually remove the Indiana Board's ability to resolve any issues arising from conflicting evidence. Consequently, the Indiana Board's approach must be more fluid, allowing for the examination of all the evidence before it to accomplish its ultimate purpose of determining the property's value. See, e.g., Marion Cnty. Assessor v. Gateway Arthur, Inc., 43 N.E.3d 279, 281-82, 284-85 (Ind. Tax Ct. 2015) (explaining that although there may be flaws in an appraisal, they do not render the entire appraisal per se invalid); Marion Cnty. Assessor v. Washington Square Mall, LLC, 46 N.E.3d 1, 14 (Ind. Tax Ct. 2015) (explaining that as Indiana's property valuation and assessment expert, the Indiana Board must ascertain which parts of an appraisal are probative to valuing property properly).

Southlake has not persuaded the Court that the Indiana Board erred when it weighed all the evidence presented to it and ultimately determined which evidence it found most probative. See Wigwam, 115 N.E.3d at 537 (explaining that when the Indiana

20

Board exercises its discretion and weighs evidence, the Court will not then reweigh that evidence absent an abuse of discretion); Monroe Cnty. Assessor v. SCP 2002 E19 LLC 6697, 77 N.E.3d 270, 273 (Ind. Tax Ct. 2017) (indicating generally that the Court will not reweigh evidence unless the Indiana Board's decision is clearly against the logic and effect of the facts and circumstances before it), review denied. Accordingly, the Court will not reverse the final determination on this basis.

## 2.     Non-Taxable Property

This Court has previously explained the principle that Indiana's property tax system taxes the value of real property, not the business value, the investment value, or the value of contractual rights that may be associated with that real property. Stinson v. Trimas Fasteners, Inc., 923 N.E.2d 496, 501 (Ind. Tax Ct. 2010) (concluding, therefore, that "market value-in-use, as determined by objectively verifiable market data, is the value of a property for its use, not the value of its use"). See also IND. CODE § 6-1.1-1-15 (2011) (delineating what constitutes "real property" for purposes of property tax assessment). On appeal, Southlake maintains that the final determination is contrary to law because it violates this principle by valuing the property without removing a) business income generated by or through the Mall's RMUs, Brand/Media, Central Plant and CAM reimbursements, and b) the intangible value arising from the Mall's start-up costs and anchor inducements. (See, e.g., Pet'r Br. at 20-24, 30-37; Oral Arg. Tr. at 41-53.)

### a.     Business Income

As earlier indicated, when Kenney made his overall income projection for the Mall, he included "specialty leasing" income, i.e., income from RMUs, kiosks, TILs, and Brand/Media, as well as revenues generated through its Central Plant and CAM

21

reimbursements. (See, e.g., Cert. Admin. R. at 1826, 1842, 1845, 1848, 1851.) Kenney believed that all of this income was attributable to the Mall's real property because it was generated from the occupancy and use of its retail space. (See, e.g., Cert. Admin. R. at 1826, 3851-63.) The Indiana Board agreed. (See generally Cert. Admin. R. at 3540-42 ¶¶ 118-22.) On appeal, Southlake argues, however, that the Indiana Board erred specifically regarding the income from RMUs, Brand/Media, Central Plant reimbursements, and CAM reimbursements. (See Pet'r Br. at 20-24; Oral Arg. Tr. at 28.)

### 1) Retail Merchandising Units

Determining whether income is attributable to real property can be a matter of conflict between appraisers. See THE APPRAISAL OF REAL ESTATE at 478 (acknowledging, for instance, that depending on its source, "service-derived income may or may not be attributable to the real property"). Consequently, when the Indiana Board must resolve conflicting opinions regarding the source of income, its resolution is generally the result of how effectively a party has persuaded it that its opinion is more credible and reliable than that of the other party. See Trimas Fasteners, 923 N.E.2d at 502.

In this case, Kenney and Lennhoff provided the Indiana Board with conflicting opinions regarding the source of the RMU income. While Kenney admitted that the RMUs themselves were personal property, he testified that the source of their income was from the use of the space in the Mall on which they were located. (See Cert. Admin. R. at 3852-53, 3861.) In contrast, Lennhoff believed that the source of that income was attributable to the payment of a "license" and therefore constituted business income as opposed to real property income. (See Cert. Admin. R. at 831, 4965-67.)

The Indiana Board weighed the competing opinions and concluded that Kenney's

was more persuasive. (See Cert. Admin. R. at 3541-42 ¶ 121.) As support for its conclusion, the Indiana Board noted that while the RMU income may not have been listed on the Mall's rent rolls, the Mall reported the income on its income statements as "leasing" revenue. (See Cert. Admin. R. at 3540-41 ¶ 118.) (See also Cert. Admin. R. at 2388-2435, 4440-42.) Moreover, there is evidence in the administrative record that indicates that a license is different than a lease simply because a "license is a temporary, a more short-term [contract], and it's revocable[.]" (See Cert. Admin. R. at 4440-42.) From this evidence, the Indiana Board inferred that the income from RMUs was really no different than the rental income received from the Mall's inline tenants because both were simply leasing space, the RMU tenants in the Mall's concourse and the inline tenants in the inline space. (See Cert. Admin. R. at 3540-42 ¶¶ 118, 121.) Because this evidence reasonably supports the Indiana Board's conclusion that RMU income was attributable to the Mall's real property, the Court will not disturb that conclusion.[15]

### 2) Brand/Media

Southlake also complains on appeal that because Kenney was unable to provide definitive testimony regarding the nature of "Brand/Media" income, the Indiana Board could not have made any determination that it in fact constituted real property income. (See Pet'r Br. at 20-22.) In other words, Southlake argues that the Indiana Board should have found that the Assessor failed to present substantial and reliable evidence that this

---

[15] The Indiana Board noted, however, that the actual value of the RMUs themselves had to be extracted from the overall valuation of the Mall. (See Cert. Admin. R. at 3541-42 ¶ 121.) To that end, it determined that Lennhoff's method of extracting both a return on and of the RMUs from the Mall's NOI was more appropriate than Kenney's deduction of the RMUs' depreciated value (indicated on the Mall's personal property tax returns) after capitalizing the Mall's NOI. (See Cert. Admin. R. at 3541-42 ¶ 121.) (Compare also Cert. Admin. R. at 1826, 1842-43, 2436-54, 3862 (Kenney's method) with 879, 881-82, 4898-4904 (Lennhoff's method).)

income was attributable to real property. (See Pet'r Br. at 20-22.)

In its final determination, the Indiana Board concluded that "Brand/Media" income was attributable to the real property because it was income received for the use of Mall space for advertising purposes. (See Cert. Admin. R. at 3523 ¶ 79 n.19.) The testimony of the Mall's general manager during the administrative hearing reasonably supports that conclusion. (See, e.g., Cert. Admin. R. at 4442 (explaining that "Brand/Media" entry on the Mall's income statements reflected income received for the "hanging [of] banners . . . [or placing] stickers on the doors at entranceways advertising a movie or a grand opening of a store"). As a result, the Court will not disturb this finding either.[16]

### 3) Central Plant Reimbursements

In its final determination, the Indiana Board found that the Mall "charged [tenants] a flat 15% fee on both electricity and water for each year under appeal" and to the extent that fee exceeded actual cost, it was a profit to the Mall that should be extracted from the valuation analysis as business income.[17] (Cert. Admin. R. at 3547 ¶ 134.) Neither Southlake nor the Assessor contest this decision. (See Pet'r Br. at 22; Br. Amicus Curiae

---

[16] Southlake has asserted that if the income from the RMUs and Brand/Media is considered to be real property income, the Indiana Board erred in adopting Kenney's estimates because he "simply transferred [them as ] line-items from [Southlake's] financials" without any corroborating support that they reflected the "market." (Pet'r Br. at 20-21 (citing Cert. Admin. R. at 3844, 4158-63).) But see supra pp. 15-18 (explaining that Kenney's income estimates reflected the market).

[17] "Some regional shopping centers purchase electricity on a wholesale basis and resell it to the tenants on a retail basis, keeping the difference as a profit. If this is the case, [an] appraiser should consider whether the profit component represents income to the business or income to the real property." THE APPRAISAL OF REAL ESTATE at 482.

("Resp't Br.") at 19-31.)[18]

Nonetheless, Southlake maintains on appeal that the Indiana Board failed to apply its determination to the profits generated through the Mall's Central Plant. (Pet'r Br. at 22.) (See also Cert. Admin. R. at 3859-60 (indicating that "Central Plant" refers generally to the Mall's heating and cooling systems).) Southlake explains that

> [t]he Board never explains why it is appropriate to remove profits from electricity and water utilities, but not other utilities like Central Plant. [In fact, t]he Board simply ignores Central Plant in its analysis. There is no legitimate basis for excluding [] profits from electricity and water, while failing to exclude profits . . . attributable to Central Plant.

(Pet'r Br. at 22 (citations omitted).)

The administrative record in this case reveals that the Mall has been reimbursed more than 100% for its Central Plant expenses. (See, e.g., Cert. Admin. R. at 1829 (Kenney's acknowledgment that the Central Plant generated a profit), 2416, 2426, 2435 (Southlake's income statements reflecting Central Plant expense recovery ratios).) Given that there is no discussion whatsoever in the final determination regarding the Central Plant or its profits, the Court remands this issue to the Indiana Board for its consideration.

### 4) Common Area Maintenance Reimbursements

Kenney's income analysis also indicated that the Mall's CAM revenues exceeded its actual cost. (See, e.g., Cert. Admin. R. at 1842.) Southlake argues that as a result, Kenney – and thus the Indiana Board – improperly included the CAM profits in the Mall's NOI because it was business income. (See Pet'r Br. at 22-23.)

---

[18] The Lake County Board of Commissioners initially filed, but subsequently withdrew, its appearance in this matter as amicus curiae. Thereafter, the brief it filed was adopted by the Court as the brief for the Lake County Assessor. Southlake Indiana, LLC v. Lake Cnty. Assessor, Case No. 18T-TA-00030 (Ind. Tax Ct. July 23, 2019) (order adopting amicus curiae brief as that of the Assessor).

The Indiana Board's analysis with respect to CAM profits is as follows:

> CAM charges are common in commercial leases and often include administrative charges that are above the actual expenses. The Board does not find that an overall CAM profit center deduction should be made, and in any event, there is no expert testimony as to what a market CAM profit would be.

(Cert. Admin. R. at 3547 ¶ 133 (citation omitted).) For purposes of this Court's review, however, this analysis is insufficient. Indeed, it provides no reasoning, or refers to any evidence, that tells the Court <u>why</u> a CAM profit center deduction is not appropriate. (<u>But see</u> Cert. Admin. R. at 4087 (where Kenney himself acknowledges that any mark-up on CAM expense reimbursements should be excluded from income as profit).) Moreover, the Indiana Board's indication that it needed further market data before it could address the issue is inconsistent with how it extracted utility profits from NOI when addressing the corresponding Central Plant issue (<u>i.e.,</u> reimbursement exceeds cost). Accordingly, the Court remands the issue to the Indiana Board for its consideration.

### b.    Intangible Value

Determining whether a property's income incorporates intangible value and, if so, how to best quantify that value, "has been highly controversial among real property appraisers, particularly over the past 30 years."[19] <u>See</u> THE APPRAISAL OF REAL ESTATE at

---

[19] For instance, in as early as 1997, the Iowa Supreme Court rejected the business enterprise valuation theory (or the TAB value method as it is referred to in this case) as a generally recognized appraisal method. <u>See</u> <u>Merle Hay Mall v. City of Des Moines Bd. of Rev.</u>, 564 N.W.2d 419, 424 (Iowa 1997). The Court discounted the method because it was not only used almost exclusively in tax assessment cases (as opposed to, for example, mall appraisals for the purpose of obtaining mortgages), but also because it "was designed in the late 1980s by a group of shopping mall owners in cooperation with real estate appraisers and real estate professors in a group called 'SCAN' (shopping center assessment network)" for the purpose of counteracting the "dramatic rise in the sale prices of shopping malls." <u>Id.</u>

703-15. Accordingly, "[i]t is important for all involved in this form of valuation work to understand the history and intensity of the debate and to understand the various alternative methodologies advocated by real property appraisers regarding how intangible assets should be accounted for in the valuation process." Id. at 710-11 (discussing four of those methodologies, two that are advanced in this case). In any event, all the intangible valuation methodologies "have both theoretical and empirical aspects[:] . . . [t]hey are made for stated reasons, and they rest on particular data. In order for any [one of those methodologies] to have persuasive force in a factual finding of value, it should rest on cogent reasoning and be founded on reliable data." Chesapeake Hotel LP v. Saddle Brook Twp., 22 N.J. Tax 525, 532 (N.J. Tax Ct. 2005).

Kenney believed that shopping malls rarely present intangible value. (See Cert. Admin. R. at 3775-82.) (See also Cert. Admin. R. at 2583 (explaining in part that, unlike hotel properties where the value of the real property is often based on the revenue of the business occupying the property, the value of retail properties is measured by the rent for the real property).) He asserted, however, that expensing a management fee as he did would adequately account for and remove any intangible value that may be present in the Mall's income. Kenney believed that his view was consistent with the Rushmore Method, also known as the Management Fee Method, which posits that

27

any intangible value arising from a [going concern] can be measured by capitalizing the management fee necessary to compensate a third party to run the business. . . . If the goal is to exclude intangible value from an estimate of real property value, the management fee approach can be applied by including a [going concern] management fee as an operating expense. . . . Theoretically, under this method, any value arising from the management of the business has been excluded.[20]

(Cert. Admin. R. at 2542, 2553-56 (quoting INT'L ASS'N ASSESSING OFF. SPECIAL COMM. ON INTANGIBLES, UNDERSTANDING INTANGIBLE ASSETS AND REAL ESTATE: A GUIDE FOR PROPERTY VALUATION PROFESSIONALS at 12-13, 2006), 3781-83.) See also THE APPRAISAL OF REAL ESTATE at 712.

Lennhoff, on the other hand, asserted that a management fee expense would not remove all intangible value present because a "management fee is an ongoing operating expense to keep the property operational, but the start-up cost[s and anchor inducements are] the initial investment to get it up [and running]" and, for an older mall, additional anchor inducements may be necessary to keep it running. (Cert. Admin. R. at 839, 841, 4909-10, 4912.) Consequently, Lennhoff asserted that additional deductions beyond a management fee expense must be made to remove the intangible value created through

---

[20] Southlake provided testimony regarding "the ongoing debate" whether the Rushmore Method, which was originally developed within the context of hotel valuations, applies to other types of properties. (See Cert. Admin. R. at 4574, 4577, 4803-04.) Contrary to Southlake's belief, juxtaposing opposing arguments is simply not enough to demonstrate that the Rushmore Method cannot be used with respect to retail property valuations. See, e.g., THE APPRAISAL OF REAL ESTATE at 712 (recognizing that appraisers do use the management fee method to quantify the value of intangible assets inherent in non-hotel property types that incur business management fees).

In addition, Southlake argues that both Benton and Lennhoff alleged at the administrative hearing that Kenney's Rushmore Method was inconsistent with the Rushmore Method. (See Pet'r Br. at 37.) Their allegations, (see Cert. Admin. R. at 4578, 4803), however, did nothing to demonstrate to the Indiana Board how Kenney's Rushmore Method was inconsistent. See Louis D. Realty Corp. v. Indiana State Bd. of Tax Comm'rs, 743 N.E.2d 379, 384 (Ind. Tax Ct. 2001) (stating that "[a]llegations, unsupported by factual evidence, remain mere allegations") (citation omitted), review denied.

those start-up costs and anchor inducements. (See generally Cert. Admin. R. at 839-42.) To that end, Lennhoff estimated the Mall's start-up costs and anchor inducements "[b]ased on [those incurred at] several other malls [that he had] appraised," amortized them over a 15 year period (which he believed was the typical term of an anchor agreement) and solved for an annual deduction. (See Cert. Admin. R. at 839-42.)

The Indiana Board rejected both of Lennhoff's deductions. (See generally Cert. Admin. R. at 3548-51 ¶¶ 137-44.) Southlake argues on appeal that in rejecting those deductions, the Indiana Board committed reversible error because Lennhoff was the only appraiser who took the steps to remove the income created by those specific intangible assets and the Assessor did not provide any "contradictory evidence." (See Pet'r Br. at 31, 35-36; Pet'r Reply Br. at 17.) Southlake, however, misapprehends why the Indiana Board rejected Lennhoff's deductions: it did not find Lennhoff's theories persuasive in the first place.

### 1)     Start-Up Cost Deductions

During the Indiana Board hearing, Lennhoff explained that the buyer of a vacant mall property would have to incur start-up costs to get it up to a stabilized operational level; conversely, if the buyer was looking at an operating mall, those costs have already been incurred. (See Cert. Admin. R. at 4905-07.) Lennhoff theorized that the buyer in the latter example will ultimately pay a premium for the property that is already operating, explaining that the current owner expects a return on and of his initial outlay, and the prospective buyer does not have to incur those expenses himself. (See Cert. Admin. R. at 839-40, 1181, 1195.) That "premium," he concluded, represents intangible value that must be deducted from the going concern value of the property. In its final determination,

29

however, the Indiana Board found that the methodology Lennhoff used to calculate the amount of his deduction failed to provide "logical or even cogent" support for his deduction.  (See Cert. Admin. R. at 3548 ¶ 137.)

As the Indiana Board explained, Lennhoff relied on the cost approach to calculate the amount of his deduction.  First, he looked at start-up costs for other mall properties that he had appraised, determining they reflected approximately 2% of their overall valuations under the cost approach; he concluded to an equivalent deduction for the Mall from a "rough," "loosey-goosey" cost approach calculation.  (See generally Cert. Admin. R. at 839-40, 4905-10.)  The Indiana Board noted, however, that Lennhoff had also testified that the cost approach had no applicability in valuing the Mall because "'no buyer would care what it costs to build this thing.'"  (Cert. Admin. R. at 3548 ¶ 137.)  (See also Cert. Admin. R. at 4842-43.)  For the Indiana Board, this contradiction weakened the credibility of Lennhoff's position, raising the question that if market participants do not care about the costs incurred to build the property, why would they care about the costs that were incurred to open the Mall?  (See Cert. Admin. R. at 3548 ¶ 137.)

To the extent Lennhoff did not clarify that disconnect for the Indiana Board, he was unsuccessful in convincing it of the soundness of his theory for the need to remove start-up costs.  See French Lick Twp. Tr. Assessor v. Kimball Int'l, Inc., 865 N.E.2d 732, 739 (Ind. Tax Ct. 2007) (indicating that a party must make the Indiana Board, as the finder of fact, understand its evidence in order for the evidence to be considered probative; "in other words, the [party] must make its evidence work for it").  The Indiana Board's

30

conclusion that it was unnecessary to deduct start-up costs was therefore reasonable, particularly in light of the fact that the Mall opened in 1974.[21]

On appeal, Southlake has done little more than restate Lennhoff's position presumably with the hope that the Court will come to a different conclusion. (See, e.g., Pet'r Br. at 31-35.) The Court declines Southlake's invitation and affirms the Indiana Board's final determination on this issue.

2)      Anchor Inducement Deductions

Lennhoff also explained during the Indiana Board hearing that when a mall property is in its initial stages of development, the owner must induce potential anchor tenants to locate there. (Cert. Admin. R. at 4910-12.) Lennhoff stated in his appraisal report that a "mall owner needs the anchors in order to attract the mall business, which results in [inline] store rents well above what would otherwise be achievable without the anchors." (Cert. Admin. R. at 840.) (See also Cert. Admin. R. at 4711-17 (Dr. Fisher's testimony that the Mall's contracts with the anchors enabled it to develop an inline tenant roster at certain "rent-points").) Those inducements, typically in the form of land gifts, nominal-rent leases, or construction allowances, are embodied in a "favorable" contract/operating agreement. (Cert. Admin. R. at 840, 4912-13.) Lennhoff theorized that because the Mall's favorable contract "put the anchors in there" at its expense to develop a stream of inline revenue that would provide it with both a return on and of its investment, the contract represented an intangible asset that should be extracted from

---

[21] Lennhoff explains that start-up costs "include the initial marketing and grand opening event, or for older malls, the marketing program each time the property is repositioned." (Cert. Admin. R. at 839.) While Lennhoff's appraisal states that the Mall was renovated in 2006, (Cert. Admin. R. at 784), it is not readily apparent to the Court whether a "repositioning" is different than a "renovation."

31

the value of the Mall as a going concern.  (See Cert. Admin. R. at 4912-16.)

The Indiana Board concluded, however, that there were several flaws with Lennhoff's anchor inducement deduction theory and method of quantification that undermined its credibility.  First, the Indiana Board explained, "[r]ent from real property, and by extension the value associated with that income stream, is a real property right and benefit."  (Cert. Admin. R. at 3532 ¶ 105.)  See also, e.g., THE APPRAISAL OF REAL ESTATE at 4-5 (explaining that "[r]eal property includes the interests, benefits, and rights inherent in the ownership of physical real estate" and one of the rights of a property owner is to lease his property).  Accordingly, the Indiana Board concluded that the Mall's ability to collect rental income from the inline tenants as a result of the anchor inducements was not attributable to an intangible asset, but was attributable to the real property itself.  (See Cert. Admin. R. at 3549 ¶ 140.)  The Court finds this is a reasonable conclusion.

Second, the Indiana Board found that Lennhoff's claim that the anchor inducement expense needed to be deducted from the Mall's income ignored that the anchors' reduced rents were likely accounted for by the higher inline store rents.  (See Cert. Admin. R. at 3549-50 ¶ 141 (stating that "[t]he [M]all is simply trading its lost (market) rent from the anchors for higher rent from the inline stores").)  As a result, the Indiana Board implied that Lennhoff's deduction for a return on and of favorable contracts amounted to a "double-dip."  (See Cert. Admin. R. at 3549-50 ¶ 141.)  The Court finds this too was a reasonable conclusion.  See, e.g., THE APPRAISAL OF REAL ESTATE at 714-15 (noting that within the appraisal industry criticism has been "leveled at the deductions for a return on the various components of the going concern[ because they] create an opportunity for double-counting").  See also RRI Acquisition Co. v. Supervisor of Assessments of Howard

Cnty., No. 03-RP-HO-0055, 2006 WL 925212 at *5 (Md. Tax Feb. 10, 2006) (faulting Lennhoff's similar adjustments in the context of a hotel valuation, stating "the real estate market simply does not understand or address intangibles in the way [] Lennhoff suggests. To accept [his] approach would be to in effect turn expenses into intangible assets for the purpose of deducting value from the return of value on real property").

Finally, the Indiana Board explained that in quantifying the value to be accorded to the Mall's favorable contracts, Lennhoff again looked at "other malls [he had] appraised" to estimate what a prospective buyer would pay to induce anchors to locate at the property, and then amortized those amounts over a period of 15 years to arrive at an annual deduction. (See Cert. Admin. R. at 3551 ¶ 143 (referring to Cert. Admin. R. at 840-42).) But in examining his data, the Indiana Board noted the huge variances in what he reported a mall might pay to induce its anchors. (Compare Cert. Admin. R. at 841 with 3551 ¶ 143 (demonstrating that four different malls across the country paid anywhere between $1 million and $28 million in inducements to Macy's).) The Indiana Board concluded that because Lennhoff provided no analysis or explanation regarding 1) why there were such large variances, 2) how much of an impact on inline tenants was expected from those anchor inducements, and 3) what inducements were even at issue in this case, he failed to persuade it that his quantification was accurate. (See Cert. Admin. R. at 3550 ¶¶ 142-43.) Based on this rationale, the Court cannot say that the Indiana Board erred in this decision.

Here, the Indiana Board took a position that was supported by the evidence in the administrative record, but contradicted Lennhoff's opinion. Generally speaking,

> [t]here is . . . no rule of law which requires controlling effect or
> influence to be given to, and the [trier of fact is] not required to accept

> in the place of [its] own judgment[], the opinion testimony of expert witnesses, merely because of the special knowledge of the witnesses concerning the matters upon which they give their testimony. Expert opinions are not ordinarily conclusive in the sense that they must be accepted as true on the subject of their testimony, but are generally regarded as purely advisory in character; the [trier of fact] may place whatever weight [it] choose[s] upon such testimony and may reject it, if [it] find[s] that it is inconsistent with the facts in the case or otherwise unreasonable. The weight given to expert testimony is for the trier of the facts, who is not required to give it controlling influence.

Ferdinand Furniture Co. v. Anderson, 399 N.E.2d 799, 807 (Ind. Ct. App. 1980) (internal quotation marks and citations omitted). The Indiana Board was not bound to agree with Lennhoff's theoretical expert opinion regarding the presence and quantification of intangible value in the Mall. Accordingly, there was nothing impermissible about the Indiana Board's failure to accept Lennhoff's opinion regarding deductions for intangible assets.

### 3. Disparate Assessments

Finally, Southlake maintains that the Indiana Board abused its discretion by failing to meaningfully address the discrepancy between the Mall's assessment and the assessments of the other malls included in Benton's comparable assessment analysis. (See Pet'r Br. at 44; Oral Arg. Tr. at 6, 41, 53.) More specifically, it asserts that because the Indiana Board "heavily criticize[d]" both Kenney's and Lennhoff's appraisals, Benton's comparable assessment analysis "should [have] be[en] given more weight, at the very least[.]" (Oral Arg. Tr. at 54-55.) The Court disagrees.

As the trier of fact, the Indiana Board is afforded great discretion in determining the relevance and weight of the evidence before it. Sedd Realty, 125 N.E.3d at 680; Wigwam, 115 N.E.3d at 537. The Indiana Board explained that it did not reject Benton's

34

comparable assessment analysis outright; rather, it gave it little weight in comparison to the other probative evidence before it – two USPAP appraisals – that it concluded provided a better measure for determining the Mall's market value-in-use. The Court finds that this conclusion was neither against the logic of the facts and circumstances before the Indiana Board nor was it contrary to law. See Kooshtard Prop. VI, 836 N.E.2d at 506 n.6 (stating that a USPAP appraisal is the most effective evidentiary method to demonstrate a property's value). Moreover, while Benton's comparable assessment analysis may have indicated a "discrepancy" within mall assessments throughout Indiana, it is not wholly dissimilar to Southlake's other evidence. That evidence provides 1) that the cost approach – which was presumably used to determine the assessed valuations of the malls reported in Benton's comparable assessment analysis – was not an appropriate approach to use in valuing the Mall and 2) that Lennhoff's appraisal values for the Mall were still substantially higher than the assessed values of the other malls (except for one located in Fort Wayne) – including the Fashion Mall in Indianapolis. (See generally Cert. Admin. R. at 848, 889, 934, 979, 1652, 1654, 1656, 1658, 4842-43.) Consequently, in light of all the evidence, the Indiana Board did not act improperly when it chose to give Benton's comparable assessment analysis less weight than Southlake would have liked.

## CONCLUSION

When there are competing opinions about how a property should be valued, the Indiana Board must determine which opinion is more probative. On appeal, this Court will not substitute its judgment for that of the Indiana Board simply because it or

one of the parties might disagree with the decision. See Grider v. Dep't of Local Gov't Fin., 799 N.E.2d 1239, 1243 (Ind. Tax Ct. 2003).

In its appeal, Southlake has largely asked the Court to reweigh the evidence, to find Lennhoff's point of view more credible than Kenney's, and to reduce its assessment accordingly. But Southlake's disagreement with how the Indiana Board weighed the evidence does not demonstrate that the Indiana Board's final determination is unsupported by the evidence.

For the above stated reasons, the Indiana Board's final determination is AFFIRMED in part and REMANDED in part. On remand, the Indiana Board is instructed to decide the issues regarding the Central Plant reimbursements and CAM reimbursements and adjust its final value conclusions as necessary.