ATTORNEYS FOR PETITIONER:
**MARILYN S. MEIGHEN**
ATTORNEY AT LAW
Carmel, IN

**BRIAN A. CUSIMANO**
ATTORNEY AT LAW
Indianapolis, IN

ATTORNEY FOR RESPONDENT:
**BETH H. HENKEL**
LAW OFFICE OF BETH HENKEL LLC
Indianapolis, IN

# IN THE
# INDIANA TAX COURT

MADISON COUNTY ASSESSOR, )
)
    Petitioner, )
)
          v. )  Cause No. 18T-TA-00012
)
)
SEDD REALTY COMPANY, )
)
    Respondent. )

FILED
May 22 2019, 11:30 am
CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ON APPEAL FROM A FINAL DETERMINATION
OF THE INDIANA BOARD OF TAX REVIEW

**FOR PUBLICATION**
**May 22, 2019**

WENTWORTH, J.

The Madison County Assessor has challenged the Indiana Board of Tax Review's final determination that reduced the assessed value of Sedd Realty Company's River Ridge shopping center for each of the 2009 through 2012 assessment years. Specifically, the Assessor claims that the Indiana Board erred by applying a capitalization rate in its income approach that was different than the capitalization rates offered by either of the parties. Upon review, the Court reverses the Indiana Board's final determination.

**RELEVANT FACTS AND PROCEDURAL HISTORY**[1]

The subject property, referred to as River Ridge, is part of the larger River Ridge Plaza retail center in Anderson, Indiana. (See Cert. Admin. R. at 712, 717-18, 1181.) River Ridge consists of ten buildings grouped into two main strip shopping centers (north and south) both with corresponding freestanding outlot improvements. (See Cert. Admin. R. at 718, 1181, 3178 ¶¶ 8-9, 3440.) The property has approximately 350,000 square feet of building area, over 300,000 square feet of leasable space, and 75 acres of land. (See Cert. Admin. R. at 718, 1181.)

River Ridge, owned by Sedd Realty Company, Sedd Anderson, LLC, Dori Development Co., Neal Development Co., and S&I East Development Co., (collectively, "Sedd"), was constructed by Sidney Eskenazi over several decades beginning in the 1960's. (See Cert. Admin. R. at 1106-34, 4453-56.) While River Ridge was located in Anderson's primary retail corridor when it was built, retail development has since proceeded southward causing River Ridge's daily customer traffic and tenant occupancy to decline. (See Cert. Admin. R. at 726, 1229, 3744, 3850-53.) Consequently, its occupancy had fallen to 55% during the years at issue. (See Cert. Admin. R. at 4548-49.)

The Madison County Assessor valued River Ridge at $12,469,000 for 2009, $11,778,110 for 2010, $11,968,600 for 2011, and $9,950,400 for 2012. (See Cert. Admin. R. at 1106-34, 3178 ¶ 7.) Believing those values to be too high, Sedd filed appeals first

---

[1] Portions of the administrative record are confidential; consequently, this opinion will only provide the information necessary for the reader to understand its disposition of the issues presented. See generally Ind. Administrative Rule 9.

with the Madison County Property Tax Assessment Board of Appeals ("PTABOA") and thereafter with the Indiana Board.[2] (See Cert. Admin. R. at 1-406.)

In February and March of 2017, the Indiana Board conducted a hearing on Sedd's appeals. While the parties could not agree on the property's assessed value, they did agree that 1) as a lower-tier shopping center, the original assessments were too high and 2) the Assessor bore the burden of proof with respect to the 2009 assessment. (See Cert. Admin. R. at 3416-19, 3443, 3826-27.) Both parties presented appraisals that valued River Ridge for each of the years at issue using the income approach, the sales comparison approach, but not the cost approach. (See Cert. Admin. R. at 712-1054, 1178-2885, 3463-64, 3837-38.) The Indiana Board afforded no weight to either parties' sales comparison valuations, finding the analyses were not credible. (See Cert. Admin. R. at 3220-22 ¶¶ 147-52.) On appeal, neither party has challenged that finding.

### The Assessor's Income Approach Valuations

The Assessor's appraisals were prepared by David Hall, a member of the Appraisal Institute (MAI). (See Cert. Admin. R. at 3432-34.) Under the income approach,[3] Hall first determined River Ridge's net operating income ("NOI") for each year at issue. (See Cert. Admin. R. at 1359, 1786, 2213, 2640, 3549-50.) Specifically, Hall estimated

---

[2] Indiana Code § 6-1.1-15-1 allowed Sedd to pursue its 2009 through 2012 appeals with the Indiana Board without first receiving a final determination from the PTABOA. See IND. CODE § 6-1.1-15-1(o) (2009) (explaining that because the PTABOA failed to conduct a hearing on Sedd's appeals within 180 days of their filing, Sedd could appeal directly to the Indiana Board) (repealed 2017).

[3] The income approach, which "is used for income producing properties that are typically rented[,] converts an estimate of income, or rent, [a] property is expected to produce into value through a mathematical process known as capitalization." See 2002 REAL PROPERTY ASSESSMENT MANUAL (2004 Reprint) ("2002 Manual") (incorporated by reference at 50 IND. ADMIN. CODE 2.3-1-2 (2002 Supp.)(repealed 2010)) at 3; see also 2011 REAL PROPERTY ASSESSMENT MANUAL ("2011 Manual") (incorporated by reference at 50 IND. ADMIN. CODE 2.4-1-2 (2011)) at 2.

River Ridge's annual potential gross income and then subtracted the vacancy and collection losses and total operating expenses to conclude that the NOI was $998,718 for 2009, $968,610 for 2010, $966,428 for 2011, and $948,725 for 2012. (See, e.g., Cert. Admin. R. at 1355-59, 1781-88, 2209-15, 2635-40, 3549-50, 3571-80.)

Next, Hall developed capitalization rates by averaging the rates he extracted from 1) four selected retail sales, 2) Pricewaterhouse Coopers (PwC) national investor surveys, 3) the CoStar analytic survey data for Madison County, and 4) an analysis using the band of investment method. (See, e.g., Cert. Admin. R. at 1364, 3580-84.) Hall then loaded each year's capitalization rate by 1.35% to account for Sedd's share of the real estate tax expense. (See Cert. Admin. R. at 1364, 1791, 2218, 2645, 3499-500, 3584.) Hall concluded that the capitalization rate was 11.25% for tax years 2009, 2011, and 2012 and 11.70% for 2010. (Cert. Admin. R. at 1364, 1791, 2218, 2645.) After applying his capitalization rates to the property's NOI, Hall added $100,000 to each year's value to account for the property's 39-acre tract of surplus floodplain land. (See Cert. Admin. R. at 1365, 1792, 2219, 2646, 3501-02, 3584.) Accordingly, Hall determined the appraised values of River Ridge were $8,980,000 for 2009, $8,380,000 for 2010, $8,690,000 for 2011, and $8,530,000 for 2012. (See Cert. Admin. R. at 1365, 1792, 2219, 2646.)

### Sedd's Income Approach Valuations

Sedd's appraisals were prepared by Jay Allardt, a certified general appraiser and real estate broker. (See Cert. Admin. R. at 3830, 3832.) Allardt completed his first set of appraisals in 2013, but revised them more than once to adjust for, among other things, his treatment of property rights under net lease contracts and his capitalization rates. (See Cert. Admin. R. at 3837, 4170-71 (explaining that Allardt changed the appraisals

4

after learning more about the process of appraising properties for real estate tax appeal purposes).)

Under the income approach, Allardt determined River Ridge's NOI using its actual income and expense information, instead of estimating potential gross income and market vacancy and collection losses from market-level data. (See Cert. Admin. R. at 764, 890, 964, 1036, 3907, 3911-3921.) He deducted River Ridge's operating expenses from its income, and made adjustments and revisions to his initial appraisal conclusions to arrive at a NOI of $950,000 for 2009, $890,000 for 2010, $830,000 for 2011, and $690,000 for 2012. (See Cert. Admin. R. at 1152 (revised NOI conclusions); but see Cert. Admin. R. at 772, 898, 972, 1044 (Allardt's original NOI conclusions).)

To determine annual capitalization rates, Allardt first identified eleven properties that had been sold in Indiana and Ohio between 2001 and 2011 and two properties that were listed for sale in Indiana. (Cert. Admin. R. at 773-75, 899-902, 974-75, 1045-47.) The properties consisted of manufacturing facilities, office buildings, and retail shopping centers with capitalization rates ranging from 10.90% to 16.26%. (Cert. Admin. R. at 774, 900, 974, 1046.) Allardt chose a 14% overall capitalization rate for 2009 and 14.5% for 2010-2012 based on the rates of the market sales "that bracketed closer in size" to River Ridge and had similar occupancy levels. (See Cert. Admin. R. at 776, 902, 975, 1047, 4424-25.) He then confirmed the reasonableness of his capitalization rates by comparing them with survey information published by CB Richard Ellis (CBRE) for Indianapolis retail centers. (See, e.g., Cert. Admin. R. at 3962-65, 3967-70, 4425-27.)

To account for Sedd's property tax expense, Allardt loaded his capitalization rates by the same percentage that Sedd's tenants paid in total insurance expense

reimbursements. (See Cert. Admin. R. at 1152, 4427-33 (stating that tax reimbursements are typically similar to insurance reimbursements)).) As a result, Allardt applied capitalization rates ranging from 15.69% to 16.22% for resulting property values of $5,900,000 for 2009, $5,300,000 for 2010, $4,900,000 for 2011, and $4,100,000 for 2012. (Cert. Admin. R. at 1152, 3990-93, 4037-38, 4060.)

**The Indiana Board's Final Determination**

The Indiana Board issued its final determination on February 20, 2018. After reviewing the parties' competing income approaches, the Indiana Board found that Allardt "essentially valued a leased-fee interest, rather than a fee-simple interest in the property" and assigned no weight to his determination of net operating income or his conclusions under the income approach. (Cert. Admin. R. at 3226-27 ¶¶ 167-73.) The Indiana Board found Hall's approach "more credible and his data and judgments generally more persuasive[,]" ultimately adopting his conclusions of NOI for each of the tax years at issue. (See Cert. Admin. R. at 3219 ¶ 145, 3226 ¶ 166.)

Regarding the competing capitalization rates, the Indiana Board had "misgivings about Hall's market-extracted [capitalization] rate[s]" because even though they "involved retail centers of roughly the same vintage as River Ridge, they all had significantly higher occupancy rates than River Ridge." (See Cert. Admin. R. at 3228 ¶¶ 176-77 (stating "we disagree that sales of buildings with occupancy rates of 90% to 100% necessarily compare very closely to property with a market occupancy rate of 55%").) Accordingly, the Indiana Board turned to Allardt's analysis for help in determining an appropriate overall rate. (See Cert. Admin. R. at 3229 ¶¶ 179, 181.)

6

The Indiana Board used three retail properties from Allardt's original thirteen comparable properties to arrive at a 12% capitalization rate for all the years at issue. (See Cert. Admin. R. at 3229 ¶¶ 179-82 (finding Allardt's remaining ten properties irrelevant because they were either non-retail properties, a freestanding big-box building, or too far removed from the assessment dates at issue).) Then, the Indiana Board added Hall's 1.35% load to its 12% capitalization rate and applied the resulting 13.35% to Hall's NOI conclusions for each year at issue. (Cert. Admin. R. at 3229-30 ¶¶ 183-84.) After trending the 2009 valuation to the January 1, 2008 assessment date, the Indiana Board determined the proper value of River Ridge was $7,421,200 for 2009, $7,255,500 for 2010, $7,239,200 for 2011, and $7,106,600 for 2012. (Cert. Admin. R. at 3230-31 ¶¶ 184-86 3231 ¶ 186.)

The Assessor initiated this original tax appeal on April 5, 2018. The Court conducted oral argument on November 1, 2018. Additional facts will be supplied when necessary.

## STANDARD OF REVIEW

The party seeking to overturn an Indiana Board final determination bears the burden of demonstrating its invalidity. Osolo Twp. Assessor v. Elkhart Maple Lane Assocs., 789 N.E.2d 109, 111 (Ind. Tax Ct. 2003). Accordingly, the Assessor must demonstrate to the Court that the Indiana Board's final determination in this matter is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; contrary to constitutional right, power, privilege, or immunity; in excess of or short of statutory jurisdiction, authority, or limitations; without observance of the procedure

7

required by law; or unsupported by substantial or reliable evidence. See IND. CODE § 33-26-6-6(e)(1)-(5) (2019).

## LAW AND ANALYSIS

On appeal, the Assessor claims the final determination must be reversed because the Indiana Board determined the assessed value of River Ridge using capitalization rates that are arbitrary and capricious, an abuse of discretion, and unsupported by substantial evidence. (See Pet'r Br. at 1.) Specifically, the Assessor argues that the Indiana Board arbitrarily applied its subjective opinion that 12% was the correct capitalization rate for each year at issue, a rate that neither party's expert witness offered into evidence. (See Pet'r Br. at 1, 8-9, 12; Oral Arg. Tr. at 7-8.)

The Legislature has specifically authorized "the Indiana Board as trier of fact, to review the probative value of an appraisal report." IND. CODE § 6-1.1-15-4(p) (2017). When reviewing an assessment, the Indiana Board is required to "determine the relevance and weight to be assigned to the evidence" before it. 52 IND. ADMIN. CODE 2-7-2(c) (2017). Moreover, the Indiana Board "may correct any errors that may have been made and adjust [an] assessment . . . in accordance with the correction." I.C. § 6-1.1-15-4(a).

Upon weighing the parties' evidence and competing capitalization rates, the Indiana Board stated that "while Hall's analysis and underlying data say something about what an appropriate [capitalization] rate might be," it would look to Allardt's capitalization rate calculation to see if it was more persuasive. (See Cert. Admin. R. at 3229 ¶ 179.) The Indiana Board, however, did not adopt Allardt's capitalization rate, but instead, selected three of Allardt's eleven market sales that it considered relevant and

8

incorporated "the upper ends" of the PwC survey data to develop its own unique capitalization rate:

> Of the three retail properties that sold between 2008 and 2011, the overall rates ranged from 10.9% to 16.24%, with an average of 12.94% and a median of 11.7%. The properties' occupancy rates ranged from 60% to 82%[.] . . . While we have little faith in Allardt's analysis in general, we find that those three sales are relevant to determining an appropriate overall rate. [ ] Looking at the upper ends of the ranges indicated by Hall's [survey] analyses (excluding the Co-Star Analytics survey) and the rates extracted from Allardt's [three] recent sales for retail centers, we find that 12% is a reasonable overall rate for each year.

(See Cert. Admin. R. at 3229 ¶¶ 181-82.) The Indiana Board provided no further explanation of how it arrived at its 12% capitalization rate.

The overall rates from Allardt's three selected comparable properties ranged from 10.9% to 16.24%, but the Indiana Board did not choose the average of 12.94% or even the median of 11.7%. Moreover, the Indiana Board never explained how it incorporated "the upper ends" of the PwC survey data into its rate conclusion. Accordingly, the Court finds that the Indiana Board's 12% capitalization rate is unsupported by any evidence and thus, arbitrary and capricious - little more than throwing a dart at a board. See CVS Corporation (#6689-02) v. Monroe Cty. Assessor, 83 N.E.3d 1281, 1284 (Ind. Tax Ct. 2017) ("[a] final determination is arbitrary and capricious when there is no basis in the record that would lead a reasonable person to the same conclusion") (citation omitted). See also, e.g., Western Select Properties, L.P. v. State Bd of Tax Comm'rs, 639 N.E.2d 1068, 1073-74 (Ind. Tax Ct. 1994) (finding that the State Board's failure to explain its rationale for choosing a 75% obsolescence adjustment rather than 95% was unsupported by any evidence and therefore arbitrary and capricious).

9

**CONCLUSION**

In light of the Court's finding that the Indiana Board's capitalization rate is improper and the Indiana Board's finding that Allardt's rate conclusion from his comparable properties was not reliable, Hall's rate conclusion is the only remaining probative evidence of River Ridge's capitalization rates. (See Cert. Admin. R. at 3229 ¶ 179 (stating that Hall's "analysis and underlying data say something about what an appropriate overall rate might be").) Consequently, the Indiana Board's final determination is REVERSED and REMANDED with instructions for the Indiana Board to apply the capitalization rates stated in the Assessor's appraisal.