ATTORNEY FOR PETITIONER:
**BETH H. HENKEL**
LAW OFFICE OF BETH HENKEL LLC
Indianapolis, IN

ATTORNEY FOR RESPONDENT:
**BRADLEY D. HASLER**
DENTONS BINGHAM GREENEBAUM LLP
Indianapolis, IN

# IN THE
# INDIANA TAX COURT

| | | |
|---|---|---|
| ELKHART COUNTY ASSESSOR, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Cause No. 20T-TA-00003 |
| | ) | |
| E R CARPENTER CO., INC., | ) | |
| | ) | |
| Respondent. | ) | |

**FILED**

Jan 12 2021, 4:10 pm

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ON APPEAL FROM A FINAL DETERMINATION
OF THE INDIANA BOARD OF TAX REVIEW

**FOR PUBLICATION**
**January 12, 2021**

WENTWORTH, J.

The Elkhart County Assessor has appealed the Indiana Board of Tax Review's final determination that established the values of E R Carpenter Co., Inc.'s real property for the 2012, 2015, 2016, and 2017 tax years.[1]  Specifically, the Assessor claims that the Indiana Board erred by applying excess office space adjustments to the valuations of Carpenter's manufacturing facility.  Upon review, the Court reverses the Indiana Board's

---

[1]  Portions of the administrative record have been designated as confidential.  Consequently, this opinion will only provide the information necessary for the reader to understand its disposition of the issues presented.  See IND. ST. ACCESS RULE 9(A)(2)(d) (2021).

final determination.

**FACTS AND PROCEDURAL HISTORY**

Carpenter, the "world's largest manufacturer of comfort cushion products," owns three contiguous parcels of land totaling 43.25 acres in Elkhart, Indiana. (See Cert. Admin. R. at 454, 1547.) An 853,000 square foot manufacturing facility built in phases between 1982 and 2003, a 6,400 square foot truck service building constructed in 1985, and various other improvements (e.g., utility sheds, fencing, paving, and other buildings) are situated on the land. (See Cert. Admin. R. 454, 596-600.)

Believing the assessed values of two of its three parcels were too high, Carpenter sought review with the Elkhart County Property Tax Assessment Board of Appeals and then with the Indiana Board. (See, e.g., Cert. Admin. R. at 1-6, 11-12.) Carpenter did not appeal the assessment of its parcel with 9.83 acres ("Parcel 3"). (See, e.g., Cert. Admin. R. at 603-04, 1098, 1138.) It claimed, however, that its other two parcels were overassessed for the 2012, 2015, and 2016 tax years and one was also overassessed for the 2017 tax year. (See, e.g., Cert. Admin. R. at 11-12, 23, 40, 64.) The assessments of the appealed parcels totaled $17,514,200 for 2012, $18,056,100 for 2015, $17,020,400 for 2016, and $10,543,800 for 2017. (See Cert. Admin. R. at 13-17, 45-49, 60-63, 81-82, 115-16.)

On September 12, 2018, consistent with the parties' agreement, the Indiana Board issued an appeal management plan that limited the administrative hearing on Carpenter's appeals to determining the values of the parcels for the 2012 and 2016 tax years. (Cert. Admin. R. at 157, 161.) The Indiana Board explained that the parcels' 2015 and 2017 values would be determined based on the parties' pre-determined formula. (Cert. Admin.

2

R. at 157.)

In January of 2019, the Indiana Board conducted the hearing on Carpenter's appeals. Although the parties could not agree on the value of the parcels, they did agree that Carpenter's three parcels formed, and should be valued as, one economic unit that then would be adjusted to remove the value of Parcel 3 that was not under appeal. (See Cert. Admin. R. at 1301, 1554-55.) Accordingly, the parties presented appraisals that valued all three parcels as one for the 2012 and 2016 tax years. (Cert. Admin. R. at 228-834.) Carpenter's appraisals used the cost approach and the sales comparison approach, but not the income approach to estimate value. (See, e.g., Cert. Admin. R. at 240-41, 328-29.) The Assessor's appraisals also used those same two methodologies for 2012, but used all three appraisal methodologies for 2016. (See, e.g., Cert. Admin. R. at 428, 653.) The Indiana Board ultimately rejected both parties' sales comparison approach valuations and the Assessor's income approach valuation, finding that they lacked probative value. (Cert. Admin. R. at 1261-62 ¶¶ 92-94.) Neither party has challenged those findings on appeal.

Carpenter's Cost Approach Valuations

Carpenter's cost approach valuations, prepared by Sara Coers, a certified appraiser and member of the Appraisal Institute (MAI), "estimate[d] the value of the land as if vacant and then add[ed] the depreciated cost new of the improvements to arrive at a total estimate of value." (See, e.g., Cert. Admin. R. at 399-400.) See also 2011 REAL PROPERTY ASSESSMENT MANUAL (incorporated by reference at 50 IND. ADMIN. CODE 2.4-1-2 (2011)) at 2. To value the manufacturing facility, Coers used Marshall Valuation Service ("MVS") cost schedules to determine its replacement cost for each year. (See, e.g., Cert.

Admin. R. at 284, 1321-22.) Coers observed that if she had used the "industrials/light manufacturing" cost schedule (the "Manufacturing Schedule"), the value of Carpenter's manufacturing facility would have reflected built-in costs of 4% to 12% of finished office space even though it actually only contained 1% of finished office space. (See, e.g., Cert. Admin. R. at 372, 1031, 1044, 1322-23.) Thus, Coers believed that using the Manufacturing Schedule would overstate the value of Carpenter's manufacturing facility by millions of dollars because finished office space costs more than industrial shell square footage. (See Cert. Admin. R. at 1322-23, 1448-49.) (See also Cert. Admin. R. at 1114-15, 1180.)

Coers therefore estimated replacement costs using the MVS alternate calculator method, beginning with the "light industrial/warehouse shell building" cost schedule (the "Warehouse Shell Schedule") to "price out the [facility] as an industrial shell [without] any office space" and then using the "industrial interior office space" cost schedule (the "Office Space Schedule") to add in costs for "the office finish to the exact square footage[.]" (See, e.g., Cert. Admin. R. at 372-74, 1062, 1065, 1321-24.) For the 2012 tax year, Coers concluded to a total value for all three parcels of $12,700,000, and after subtracting the $220,000 value of Parcel 3, arrived at a final value for the two appealed parcels of $12,480,000. (See Cert. Admin. R. at 289, 1319-38.) For the 2016 tax year, Coers concluded to a total value for all three parcels of $15,220,000, and after subtracting the $280,000 value of Parcel 3, arrived at a final value for the two appealed parcels of $14,940,000. (See Cert. Admin. R. at 377, 1363-69.)

<u>The Assessor's Cost Approach Valuations</u>

The Assessor's cost approach valuations were prepared by Michael C. Lady, a

4

certified general appraiser and real estate broker, and J. David Hall, a certified general appraiser. (See, e.g., Cert. Admin. R. at 424-26, 583-85.) Hall and Lady, unlike Coers, used the Manufacturing Schedule to estimate the value of Carpenter's manufacturing facility because the property was used for manufacturing purposes, not primarily for storage. (See Cert. Admin. R. at 1031, 1044, 1458-60, 1563.) In addition, Hall testified that the inherent construction differences between manufacturing facilities and industrial warehouse shells (e.g., the amount of insulation, the weight of concrete slabs, and the need for electrical power) supported the use of the Manufacturing Schedule. (See Cert. Admin. R. at 1459-60.) For purposes of the cost approach, the appraisal reports valued all three parcels at $17,310,000 for the 2012 tax year and $16,550,000 for the 2016 tax year. (See Cert. Admin. R. at 433, 435, 771.) In addition, knowing that Parcel 3 was not under appeal and would be excluded, the appraisers developed a value for Parcel 3 in the amount of $241,800 for 2012 and $250,000 for the 2016 tax year. (See Cert. Admin. R. at 841, 1651-52, 1749-50.)

The Indiana Board's Final Determination

The Indiana Board issued its final determination on December 9, 2019. (See Cert. Admin. R. at 1239-66.) Specifically, it found the Assessor's cost approach valuations were more credible than Carpenter's cost approach valuations. (See Cert. Admin. R at 1262-64 ¶¶ 97-100.) Notwithstanding, the Indiana Board concluded that the Assessor's estimates overvalued the manufacturing facility by failing to adjust for its "atypical" office space. (See Cert. Admin. R. at 1264-65 ¶ 101.) As a result, the Indiana Board deducted from the Assessor's total building costs the costs attributable to the amount of office space included in the Manufacturing Schedule that exceeded the costs for Carpenter's actual

5

amount of office space (i.e., the excess office space adjustments). (See Cert. Admin. R. at 1264-65 ¶ 101.)

The Indiana Board did not make an additional adjustment for the values for Parcel 3, stating that it "declines to make an allocation for [Parcel 3, which is] not on appeal, but orders that the combined assessed values of the three parcels shall not exceed the values concluded in this determination." (Cert. Admin. R. at 1264-65 ¶¶ 101-04.) Accordingly, after applying the pre-determined formula to its new 2016 estimate, the Indiana Board concluded that the market value-in-use of the three parcels together must not exceed $16,153,610 for 2012, $14,966,585 for 2015, $15,047,747 for 2016, and $15,423,941 for 2017. (Cert. Admin. R. at 1264-65 ¶¶ 101-04.)

On January 22, 2020, the Assessor initiated this original tax appeal. The Court heard the parties' oral arguments remotely on July 16, 2020. Additional facts will be supplied when necessary.

## STANDARD OF REVIEW

The party seeking to overturn an Indiana Board final determination bears the burden of demonstrating its invalidity. CVS Corp. v. Searcy, 137 N.E.3d 1053, 1055 (Ind. Tax Ct. 2019). Accordingly, the Assessor must demonstrate to the Court that the Indiana Board's final determination in this matter is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; contrary to constitutional right, power, privilege, or immunity; in excess of or short of statutory jurisdiction, authority, or limitations; without observance of the procedure required by law; or unsupported by substantial or reliable evidence. See IND. CODE § 33-26-6-6(e)(1)-(5) (2021).

6

## LAW AND ANALYSIS

On appeal, the Assessor claims that the Indiana Board's final determination must be reversed because its adjustments for excess office space are arbitrary and capricious and unsupported by substantial evidence.[2]  (See Pet'r Br. at 14, 16-19; Oral Arg. Tr. at 6.)  The Assessor maintains that the values of the appealed parcels must be consistent with the only probative evidence in the record (i.e., her cost approach valuations and the parties' pre-determined formula) that valued the parcels at $17,310,000 for 2012, $16,493,730 for 2015, $16,550,000 for 2016, and $16,963,750 for 2017.  (See Pet'r Br. at 19; Oral Arg. Tr. at 47-53.)

Carpenter, on the other hand, responds that the Indiana Board's adjustments for excess office space are reasonable and supported by the evidence because the Assessor's cost approach valuations inflated the value of its manufacturing facility by including the value of more office space than it actually had. (See Resp't Br. at 4, 7-9.)  Moreover, Carpenter contends that even if the Court finds the Indiana Board erred by applying its excess office space adjustments, it must still subtract the Assessor's values for Parcel 3 from the combined valuations to establish the correct values for the two appealed parcels.  (See Resp't Br. at 14-17; Oral Arg. Tr. at 44-47.)

### I. The Excess Office Space Adjustment

The Assessor challenges the Indiana Board's finding that replacement costs determined using the Manufacturing Schedule must be adjusted to address the "'impact of [Carpenter's manufacturing facility's] small office space.'"  (See Pet'r Br. at 16 (citation

---

[2]  The Assessor also claims that the Indiana Board made a math error in applying the excess office space adjustments.  (See Pet'r Br. at 19-20.)  The Court does not need to address this additional claim, however, given the disposition of the case.

omitted).)  In its final determination, the Indiana Board explained that it removed the costs attributable to the amount of office space included in the Manufacturing Schedule that exceeded Carpenter's actual amount of office space:

> The Board notes that under the MVS schedules the "costs listed are actually midpoints of cost ranges." At a range of 4%-12% for office space, the midpoint is 8%.  Because the [manufacturing facility's] actual office space is 1%, Hall's replacement cost must be adjusted to remove the 7% excess office space contemplated in the [Manufacturing Schedule].  Fortunately, the cost of the excess office space can be easily calculated by applying Coers' office base costs [from the Office Space Schedule] to the square footage equal to 7% of the [manufacturing facility's] total square footage.

(Cert. Admin. R. at 1264-65 ¶ 101 (citation omitted).)   Accordingly, the Assessor's challenge hinges on whether the evidence shows that the Manufacturing Schedule's replacement costs require an excess office space adjustment to adequately value Carpenter's manufacturing facility that has only 1% of finished office space rather than 8% of finished office space.

The Indiana Board used the MVS cost schedules to calculate its excess office space adjustments, but it failed to identify the actual origin of the adjustment. Furthermore, none of the tendered MVS evidence suggests or recognizes an adjustment to replacement costs when the range of finished office space is greater in the Manufacturing Schedule than the actual amount of a property's finished office space. (See Cert. Admin. R. at 1031-87; Confd'l Cert. Admin. R. at 1085-86.)  In contrast, the MVS evidence explicitly provides adjustments for other items not represented in the Manufacturing Schedule. (See, e.g., Cert. Admin. R. at 1044 (indicating, among other things, that costs for sprinklers must be added and costs for elevators must be deducted for buildings without elevators for purposes of the Manufacturing Schedule).)  Likewise,

8

the MVS evidence explains that when "[q]ualities [] vary in buildings which are structurally similar, by reason of the interior finish[,] . . . [o]nly a thorough inspection by the appraiser or estimator of all items affecting quality, and the use of his experience or judgment, will give [the] correct [valuation] answers" for identical buildings with differing interior finishes. (See Cert. Admin. R. at 1033.) Here, comparatively, the MVS evidence does not authorize any adjustment for atypical office space as it does for sprinklers and elevators, and the Indiana Board cannot make adjustments for different interior finishes because the record does not indicate that it inspected the property or that it has the necessary authority to appraise property as the MVS directs. (See, e.g., Cert. Admin. R. at 458, 1239-66.)

Furthermore, the Manufacturing Schedule includes costs for "[a]n average amount of office space commensurate with the quality of the building[,]" typically between 4% and 12% of the total square footage. (See Cert. Admin. R. at 1031.) Coupled with the absence of an explicit excess office space adjustment, the Manufacturing Schedule's incorporation of average costs as a range rather than as exact amounts reasonably indicates wide applicability, not a mandate that manufacturing buildings must contain a precise amount of finished office space. (See Cert. Admin. R. at 1031-32.)

Pulling the band-aid off fully, the Indiana Board plucked the 8% midpoint out of the range as the benchmark without explaining why it used 8% rather than another percentage within the range (e.g., 4% - the lowest percentage in the range) to make its excess office space adjustments. (See, e.g., Cert. Admin. R. at 1232-1266.) Moreover, there is not even any evidence in the record that refers to, much less supports, any excess office space adjustment: not any witness testimony, not any exhibit, not the parties' post hearing briefs, and not any authoritative source. (See, e.g., Cert. Admin. R. at 228-1217,

9

1267-1812.)  Accordingly, the Court holds that the Indiana Board's excess office space adjustments were unsupported by substantial evidence and are arbitrary and capricious. See CVS Corp. (#6698-02) v. Monroe Cnty. Assessor, 83 N.E.3d 1281, 1284 (Ind. Tax Ct. 2017) ("A final determination is arbitrary and capricious when there is no basis in the record that would lead a reasonable person to the same conclusion") (citation omitted). See also, e.g., Madison Cnty. Assessor v. Sedd Realty Co., 125 N.E.3d 676, 680-81 (Ind. Tax Ct. 2019) (holding that the Indiana Board's failure to explain its rationale for choosing a capitalization rate was unsupported by any evidence and therefore was arbitrary and capricious).

## II.  Parcel 3

The Court now turns to Carpenter's claim that the Indiana Board failed to meaningfully deal with the evidence that demonstrated the combined cost approach valuations for Carpenter's three parcels must be reduced by the value of Parcel 3, which was not appealed.  (See Resp't Br. at 14-17.)  Carpenter explains that this reduction is necessary to conform to the record evidence.  (See, e.g., Oral Arg. Tr. at 45-47 (stating that the Assessor seeks to have her appraisers' cost approach valuations followed "lock, stock and barrel," which assumed the removal of the value for Parcel 3).)

The Assessor counters that Carpenter has waived this claim by failing to file its own petition for review on the issue.[3]  (See Pet'r Reply Br. at 13-16.)  Moreover, the Assessor contends that requiring the Indiana Board to deduct the values for Parcel 3 is

---

[3]  In addition, the Assessor made two additional conclusory arguments: 1) that any error for failure to make an adjustment for the value of Parcel 3 is de minimis and 2) that the Court should not substitute its judgment regarding the value of Parcel 3 for that of the Indiana Board.  (See Pet'r Reply Br. at 16-17.)  The Court will not consider the naked de minimis claim; moreover, the Court does not substitute its judgment for that of the Indiana Board because it remands for the Indiana Board to weigh the evidence and reach a conclusion on this issue.  See infra pp. 11-12.

10

unnecessary because it instructed the parties to make appropriate allocations. (See Oral Arg. Tr. at 47-53.) The Assessor's contentions are not persuasive for two reasons.

First, Carpenter did not waive the issue regarding Parcel 3 by raising it in its response brief because it was raised in opposition to the result sought by the Assessor in her original tax appeal. Here, the Assessor asked the Court to value Carpenter's property consistent with her appraisers' cost approach valuations, (see Pet'r Br. at 19), and Carpenter responded with its reasons why the Assessor should not prevail. (See, e.g., Resp't Br. at 14-17.) Cf. also, e.g., Ind. Trial Rules 12-13 (permitting the filing of defenses, counterclaims, and cross-claims in responsive pleadings); Ind. Tax Court Rule 1 (incorporating the Indiana Rules of Trial Procedure unless they are clearly inconsistent with the Tax Court Rules); Ind. Appellate Rule 9(D) (allowing cross-appeals to be raised in an appellee's brief). Accordingly, the Court finds that Carpenter did not waive this issue on appeal.

Second, although the Assessor argues that the Indiana Board meaningfully dealt with the evidence regarding the removal of values allocated to Parcel 3 by instructing the parties to make the appropriate allocations, (see Oral Arg. Tr. at 47-53), the certified administrative record shows that it did not. The final determination stated that "[t]he Board declines to make an allocation for the parcel not on appeal, but orders that the combined assessed values of the three parcels shall not exceed the values concluded in this determination." (Cert. Admin. R. at 1265 ¶103.) Nonetheless, during the Indiana Board proceedings, both parties' appraisers explained how they valued Parcel 3 and testified that those values should be subtracted from the final combined valuations of Carpenter's property. (See, e.g., Cert. Admin. R. at 282-83, 370-71, 841, 1319-21,1651-53.)

11

As trier of fact, the Indiana Board is required to assign relevance and weight to the evidence before it. See Sedd Realty, 125 N.E.3d at 680-81. See also, e.g., Stinson v. Trimas Fasteners, Inc., 923 N.E.2d 496, 498-99 (Ind. Tax Ct. 2010) (explaining that the Indiana Board is the finder of fact and consequently must weigh the evidence). Accordingly, the Indiana Board may not simply refuse to consider probative evidence or the parties' related arguments, as it has here, but must deal with both in some meaningful way. See Hebron-Vision, LLC v. Porter Cnty. Assessor, 134 N.E.3d 1077, 1085 (Ind. Tax Ct. 2019); Clark v. State Bd. of Tax Comm'rs, 694 N.E.2d 1230, 1235 (Ind. Tax Ct. 1998) (explaining that the failure to consider probative evidence in some meaningful manner is arbitrary and capricious); Jackson v. Cigna/Ford Elec. & Refrigeration Corp., 677 N.E.2d 1098, 1102 (Ind. Ct. App. 1997) (stating the general rule that administrative agencies must set out written findings of fact so that on judicial review, courts do not have to speculate as to the agency's reasoning). The Court will not invade the province of the Indiana Board as trier of fact, but instead remands the issue for the Indiana Board to weigh the evidence and argument that was before it regarding the amount and the impact of the value of Parcel 3 in determining the proper valuation of Carpenter's two appealed parcels.

## CONCLUSION

For the foregoing reasons, the Indiana Board's final determination is REVERSED and REMANDED. On remand, the Indiana Board shall weigh the competing evidence regarding the value of Parcel 3, adjust the Assessor's 2012 and 2016 cost approach valuations accordingly, and then apply the pre-determined formula to the newly adjusted 2016 cost approach valuation for purposes of the 2015 and 2017 tax years.